**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DAHLIA DISTIN                                                                                                       PLAINTIFF

v.                                              No. 4:08CV00044 JLH

THE BRIDGEWAY, INC.                                                                                          DEFENDANT

**OPINION AND ORDER**

Dahlia Distin brought this action pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and pursuant to 42 U.S.C. § 1981, alleging that her former employer, The BridgeWay, Inc., has subjected her to terms and conditions of employment that were less favorable than the terms and conditions afforded to white employees, and that The BridgeWay retaliated against her for making a complaint to the Equal Employment Opportunity Commission (EEOC). The BridgeWay, Inc., has filed a motion for summary judgment. For reasons stated hereinafter, that motion is denied.

**I.**

A court should enter summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. If the moving party meets this burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue*

*for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all inferences in his favor, mindful that summary judgment seldom should be granted in discrimination cases where claims are often based on inferences.  *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (collecting cases).  *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

## II.

The BridgeWay is an inpatient psychiatric hospital and substance abuse treatment facility. Distin is a registered nurse who was hired by The BridgeWay in August of 1997.  In January of 1998, she was promoted to nursing supervisor.

Distin also was employed by Woodland International Research Group, which performs research regarding psychiatric medications.  In May of 2007, a former patient reported that he had left The BridgeWay and gone to Woodland to participate in a research study, that at Woodland he was taken off all of his medication and was informed that he did not qualify for the study, and that he was discharged from Woodland with instructions to contact his primary care physician.  The patient was in trouble and not doing well.  He felt that he had been sent to Woodland by The BridgeWay.  He had learned about the research study from a BridgeWay technician named Damon Connelly.  The patient allegedly felt threatened as a result of a conversation with Distin, but there is no testimony in the record from the patient or from anyone who spoke directly with the patient

about his complaints. The record contains an affidavit from Barry Pipkin, interim CEO of The BridgeWay, in which Pipkin says that the patient "complained that Dahlia Distin had told him not to tell the BridgeWay he was in the study and indicated that he felt threatened by Ms. Distin's comments." The record also contains a transcript of a deposition in which Pipkin said that the patient reported that Distin had told him not to contact patients at The BridgeWay, that "the big guys or the big whigs" or something along that line were aware of this and that the patient or Distin could get in trouble if he did that again. These two accounts of what the patient said are both based on what a staff member told Pipkin, not Pipkin's own conversation with the patient, and the two accounts differ somewhat as to what Distin allegedly said to the patient. After the patient's complaint was made known, Vera McCulloch, risk manager for The BridgeWay, interviewed the patient and made a memorandum of the interview that included two questions and answers that refer to Distin:

> 4. Did you have any conversation with Dahlia related to the drug study and if so what was stated in the conversation?
> Reply: Jeff states he phoned Bridgeway after he left Bridgeway and Dahlia answered two days in a row.
>
> * * *
>
> 7. Were you told by anyone at Bridgeway to not talk about your involvement in the drug study?
> Reply: Dahlia told me while I was at Woodlawn [sic] not to talk about her being there to anyone at Bridgeway. Dahlia told her [sic] she could be in hot water, if he talked about her being at Drug study.

Although the patient was a male, the second sentence of the reply to question 7 refers to the patient as "her," which makes it impossible to ascertain from the text whether "she could be in hot water" means that the patient could be in hot water or that Distin could be in hot water.

As a result of the complaints by the patient, Pipkin suspended Distin and Connelly, both of whom are African Americans, without pay pending further investigation. On June 1, 2007, Distin filed a charge of discrimination with the EEOC stating that her suspension was due to her race.

Distin testified in her deposition that on June 8, 2007, she called The BridgeWay, asked an employee named Gwen Jones if she was on the schedule for the following week, and was told by Gwen that she was. Thirty minutes later, another employee named Jackie Campbell called back and said that Pipkin had said that the suspension would continue until a meeting occurred. Distin then called the human resources department at The BridgeWay, which referred her to Pipkin. When asked about that conversation, Distin testified:

> Pretty much it was about conflict – making the decision as to where I'm going to work, and that I pretty much did not see where there was a conflict with my employment at Woodland and BridgeWay because I didn't do the same thing as far as being a nurse supervisor and a nurse coordinator.

On June 15, 2007, The BridgeWay received a copy of Distin's EEOC charge of discrimination. On that same day, Pipkin met with Distin and gave her an ultimatum to choose between her employment at The BridgeWay and her employment at Woodland. Connelly was given the same ultimatum, as was Dr. Nguyen, a unit director at The BridgeWay and medical director at Woodland. Dr. George Konas, a white medical doctor who performed physicals and took patient histories for The BridgeWay and other facilities, including Woodland, as an independent contractor, was given no such ultimatum.

On June 22, 2007, Pipkin wrote a letter to Distin stating that she needed to inform The BridgeWay of her intentions by June 26, 2007. According to Distin, the letter was sent to her former address, not her current address, so she did not receive it until June 28, 2007, by which time she had already been terminated.

**III.**

Distin alleges that she was subject to disparate treatment because of her race. When a plaintiff lacks direct evidence of discrimination, she "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). The Eighth Circuit has defined direct evidence as "'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision.'" *Cronquist v. City of Minneapolis*, 237 F.3d 920, 925 (8th Cir. 2001) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)). Here, there is no direct evidence of racial discrimination.

Because Distin has no direct evidence of racial discrimination, she must establish a prima facie case under the *McDonnell Douglas* three-step analysis. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998). The elements of a prima facie case are: (1) the plaintiff was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful discrimination. *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006); *Twymon v. Wells Fargo & Company*, 462 F.3d 925, 934 (8th Cir. 2006). The BridgeWay concedes, for purposes of the summary judgment motion, that Distin has established a prima facie case.

Therefore, the burden of production shifts to The BridgeWay to articulate a legitimate, nondiscriminatory reason for the adverse employment action against Distin. "To accomplish this, a defendant must clearly set forth, through the introduction of admissible evidence, the reasons for

[its actions]. The explanation provided must be legally sufficient to justify a judgment for the defendant." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981). Here, The BridgeWay says that Pipkin had a legitimate, nondiscriminatory reason for suspending Distin because the patient at issue had felt threatened by her comments, and it had a legitimate, nondiscriminatory reason for terminating her employment because she had a conflict of interest so long as she remained employed at the Woodland.

On the issue of suspension, as noted above, Pipkin has given two different versions of what was reported to him regarding the patient's feeling threatened. In his affidavit he says that the patient "complained that Dahlia Distin had told him not to tell The BridgeWay he was in the study and indicated that he felt threatened by Ms. Distin's comments." In his deposition, Pipkin testified that the patient had been told by Distin not to contact patients at The BridgeWay, and that "the big guys or the big whigs or something like that" were aware of the situation and the patient could get into trouble if he did that again. As the quotation above shows, Vera McCulloch's memorandum of her interview with the patient is ambiguous as to whether the patient felt threatened, with the confusion being created by McCulloch's indiscriminate use of first person, second-person masculine, and second-person feminine pronouns to refer to the patient. Inasmuch as there appear to be three different accounts of what the patient said in regard to Distin – two of them from Pipkin and one in a state of confusion – it is hard to say that the undisputed facts show that there was a legitimate, nondiscriminatory reason for the suspension, or, if there was, that there is no evidence that this reason was a pretext.

With respect to the termination, as noted, The BridgeWay argues that Distin had a conflict of interest in working both at The BridgeWay and at Woodland, which is a legitimate,

6

nondiscriminatory reason. The issue is whether Distin has presented evidence to create a genuine issue of fact as to whether that reason is a pretext for racial discrimination. She points to several facts that she contends create a genuine issue of fact. For example, she notes that the only persons who were given the ultimatum to resign from Woodland or be terminated by The BridgeWay were two African Americans (herself and Connelly) and a Vietnamese person, Dr. Nguyen, whereas, the only white person working at both facilities, Dr. Konas, was given no such ultimatum and was not terminated. She also notes that The BridgeWay allows doctors to conduct medical research at its facility and employs a white doctor, Dr. Brad Diner, and a white nurse, Bud Green, who conduct medical research, sometimes at The BridgeWay and sometimes on an outpatient basis, on behalf of pharmaceutical companies. Neither of them has been given an ultimatum to choose between employment at The BridgeWay and off-site research projects. She also notes that patients who have been discharged from The BridgeWay are often discharged to Woodland based on referrals from The BridgeWay's medical team.

The BridgeWay argues that Dr. Konas is not similarly situated because he was an independent contractor, not an employee, who has little patient contact and does not make discharge planning decisions. The BridgeWay argues that the research conducted at its facility is distinct from the research at Woodland because the persons responsible for The BridgeWay have the opportunity to review and approve the research protocol. The BridgeWay also argues that Dr. Diner and Bud Green are not similarly situated because, while Dr. Diner may oversee some outpatient studies at his clinic, Pipkin's concern was with the unique nature of the Woodland facility.

After reviewing all of the evidence submitted in support of and in opposition to the motion for summary judgment, the Court has come to the conclusion that there is a genuine issue of material

fact. Because this case is scheduled for a bench trial and it will be necessary for the Court to make findings of fact after hearing all of the evidence, the Court is reluctant to say too much for fear of giving the appearance of having prejudged the facts, which would be a false appearance.

With that caveat, the Court notes that, while Pipkin has testified that he believed that it was a conflict of interest for professionals to be employed both at Woodland and at The BridgeWay because it could create the appearance of a connection between the two and could create the appearance that The BridgeWay approved of the research at Woodland, it appears from the deposition testimony that The BridgeWay has in the past and continues in the present to refer patients to Woodland. If so, that might support an inference that the stated reason for terminating Distin – that her employment with Woodland created a conflict of interest – was pretextual. Likewise, the fact that Dr. Diner and Bud Green are employed at The BridgeWay but conduct research off-site tends to undercut Pipkin's testimony that he regarded Distin's employment at Woodland as a conflict of interest. It is true that The BridgeWay makes distinctions between those situations and the situation involving Distin, but whether those distinctions suffice to avoid the conclusion that the stated reason for discharging Distin was pretextual is an issue for the trier of fact. Although, standing alone, those facts might not justify an inference that the reason for Distin's discharge was racial discrimination, those facts in conjunction with the other facts create a genuine issue of material fact as to whether the termination of Distin was motivated at least in part by race. Among the other pertinent facts are that the only persons affected by the decision to issue an ultimatum to persons who were employed both by The BridgeWay and Woodland were minorities, whereas all of the persons who continue to work at The BridgeWay while doing pharmaceutical research outside of The BridgeWay are white.

The evidence that Distin would present on her retaliation claim is closely interrelated with the evidence that she would present on the claim of racial discrimination. She argues that retaliation can be inferred from the fact that she was given the ultimatum on June 15 – the same day The BridgeWay received notice of her EEOC charge. The BridgeWay argues that Pipkin had delivered the ultimatum on June 8, but the evidence is not clear as to whether he in fact did so. In any event, because the evidence on the retaliation claim is so closely interwoven with the evidence on the discrimination claim, no useful purpose would be served by granting summary judgment on the retaliation claim while denying it on the discrimination claim.

> [A] district court in passing on a Rule 56 motion [for summary judgment] performs what amounts to what may be called a negative discretionary function. The court has no discretion to *grant* a motion for summary judgment, but even if the court is convinced that the moving party is entitled to such a judgment the exercise of sound judicial discretion may dictate that the motion should be *denied*, and the case fully developed.

*McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979); *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2728, at 525-26 (3rd ed. 1998) ("[I]n most situations in which the moving party seems to have discharged his burden of demonstrating that no genuine issue of fact exists, the court has discretion to deny a Rule 56 motion. This is appropriate since even though the summary-judgment standard appears to have been met, the court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial.") Because the evidence for both claims overlaps to a large extent, The BridgeWay's motion for summary judgment on Distin's retaliation claim is also denied, and Distin will be allowed to proceed on both claims at trial.

## CONCLUSION

In summary, the Court believes that there is a genuine issue of material fact and hence the necessity for a trial at which the Court can see and hear the witnesses testify in person and make judgments of credibility. Therefore, the motion for summary judgment is DENIED. Document #8. Plaintiff's motion to supplement the record is DENIED as moot. Document #17.

IT IS SO ORDERED this 21st day of January, 2009.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE